Your Honors, Ahilan and Arlondan, and with me is Judy Rabinowitz for the petitioners, Mr. Soas and Diouf. Your Honors, we've allocated 20 minutes for those two cases. We'd like 5 minutes of rebuttal. So I guess that leaves me about 15 minutes. How do you say, is it Diouf? It's Diouf. It's the D-I-O-U-F, right? Yeah, but it's pronounced Diouf like J-U-F. Thank you. May it please the Court. Your Honors, the District Court's preliminary injunction order in these cases got it exactly right. It's a straightforward application of this Court's decisions in Tijani and Nataraja, and holds that our clients should not be subjected to prolonged detention without a simple detention hearing. How does the District Court's order comply with Federal Rule of Civil Procedure 52? Your Honor, both sides have said in these cases that the order should be read to incorporate the arguments that are made in the briefing. But that's not what National Popsicle Corp. v. Icicler says, is it? Your Honor, there's not a whole lot of explanation in the preliminary injunction order, and I think... Is there any? Excuse me? Is there any? There's really only the form language in the beginning and the rest of the decision itself, Your Honor. But doesn't the rule require such an explanation? Well, I think it can be read to require a greater explanation than is in the District Court's... Let me say it a different way. If this didn't involve an issue that you passionately believe in, would there be any question in your mind that this doesn't satisfy Rule 52? Well, Your Honor, I do think that the parties have to assert it. And here the government explicitly states that they think that the order should be read to incorporate the reasons in the brief. I don't think that, other than the government's concession, I would be willing to... So you're basically saying that this is a collective waiver of the issue? Yes, Your Honor. I don't think that it sort of goes to the subject matter jurisdiction of this Court reviewing the preliminary injunction. Beyond that, I'm not going to defend the detailed level of the explanation in the preliminary injunction order, Your Honor. Thank you. The government asks this Court essentially to nullify the decisions in Tijani and Nataraja. And really to give it extraordinary power, the power to hold people for however long it takes for their cases to finish, even if that means for years of detention, without a simple detention hearing. And I really think that's inconsistent with Nataraja and Tijani. Because in Nataraja, this Court held that when Congress wants to authorize detention beyond six months, it does so explicitly. And it did do so explicitly, Your Honor, in the Patriot Act. It authorizes detention beyond six months, but limits that detention to national security cases. And even then, it provides greater procedural protections than our clients received here before we won in the district courts. And Tijani, Your Honor, so excuse me, so Judge Fischer, when you said you're interested in knowing what statute governs, we don't think that what statute governs is particularly important to the resolution of these cases. Because Nataraja holds that the statutes that don't explicitly authorize detention beyond six months should not be read to do so. And none of the statutes here do that. So you're suggesting that there's an automatic cutoff at six months? No, Your Honor. There's a hearing at six months. Now, whether or not you get out on the hearing is a different matter. But at detention of six months, there has to be a determination that the detention continues to be reasonable. And we think that's required by the cases. This defendant had a hearing, though, right? Yes. Both of the petitioners here had their hearings, and they won. The immigration judge found that they were not dangerous or flight risk. In fact, the immigration judge called the government's argument that Mr. Stoess, a flight risk, disingenuous, Your Honor. So your argument, I gather, is that no hearing is even necessary. They should just be released. Well, he has been. Right. Well, now... No, I mean, stay out, basically. Yes, exactly, Your Honor. That's right. In Tijani, the court found that there was a serious constitutional problem with holding the alien there, who had obtained a state of removal in his immigration case, for 28 months, and construed Section 1226, therefore, to require a hearing where the government actually bears the burden of proof. Now, that, I think, answers the question that you asked, Judge Fischer, what statute governs these cases. All of the petitioners here have states of removal. And Tijani held that where the petition had a state of removal, Section 1226 is what they construed. Now, there's not a detailed explanation of that in Tijani, but I don't think it's possible to reconcile the government's statutory position with what the court did in Tijani. Well, the state of removal, you say they have a state of removal, but the state of removal arises out of a habeas proceeding, right? No, Your Honor. The state of removal happens when you have a final BIA order. Then, when you file your petition for review, you then... The Ninth Circuit. The Ninth Circuit grants a state. It's not... So, in your... Mr. Jukes and Soa. They both have states issued out of this court. Yes, out of this court. On a direct appeal from the BIA. Yes, on the petition for review is the technical term that... Yeah. From the BIA. That's right. Okay. Sorry, go ahead, Your Honor. You said all the petitions have states of removal. I wasn't aware that all of them issued out of this court. Oh, I don't know the answer to Mr. Prieto. You're talking about... Yes, Your Honor. I know that all four have states of removal. How they got them, I'm not sure. And, Your Honor, Tijani held that to remedy the constitutional problem, they should be given a bond hearing. And that's all that we seek. All that we seek is a bond hearing. And, as you said... Yes, Your Honor, we got that bond hearing, and they're out. And all we ask really is that in Mr. Juke's case, that you affirm that. In Mr. Soa's case, because it was vacated as moot, we think you should reverse the decision vacating it as moot in order that the petition be granted because of what happened at the hearing. I think the facts in these cases, Your Honor, show why this hearing is so important. Mr. Juke is a university graduate. He's lived in this country more than 10 years. He's married to an American citizen. But if we had lost him in the district court, he would have been held for almost three years as of today, even though he's never been convicted of a removable offense. And, you know, Mr. Soa's case, I think, is even worse. He's a Christian minister from Indonesia. He's never even been arrested for a crime, let alone convicted. And he would have been detained for three and a half years if we had lost him in the district court as of today. And the government says that notwithstanding the... It's a statement that he is now a Christian minister. You said he was a Christian minister in Indonesia, but he's become a Christian minister. Yes, Your Honor. He was a Christian in Indonesia. He was not a Christian minister at that time. He has become one. That's what I'm suggesting. I understood you to say he was a Christian minister in Indonesia. No, Your Honor. No, Your Honor. Since he's become a minister. He practiced there as well. It's part of the basis for his asylum claim that he didn't become a minister until he was here. Counsel, I'm interested in Tijani. It's a very interesting case. It asserts two things that seem to be... come out of thin air, one of which is the burden of proof issue. What's your position with respect to both under 1226 and 1231 that there are CFR regulations that put the burden of proof on the petitioner in both cases? Do you believe that Tijani overruled those regulations by innuendo? It did. It's certainly true that there could have been more explanation. In fact, Judge Teshima asked... said, you know, we really need the clarity on this. And I think the absence of that clarity is reflected in... By the way, how should we read our friend Judge Teshima's concurring opinion? That's not the opinion of the court, right? It's purely persuasive. The opinion is cryptic. And it says nothing about these things. But it is your position, I gather, that both 8 CFR 236.1C8 and 8 CFR 241BD1 are impliedly overruled by Tijani. Well, let me say a little bit more about that, Your Honor. I think that the regulations have to be construed to not apply to prolonged detention where the person continues to litigate their case. Their immigration case. And that's what's presented in these cases, Your Honor. Tijani, it's right. It's not a detailed explanation. But it's drawing on a wealth of case law that I think you see there's a citation there to Cooper v. Oklahoma. Cooper v. Oklahoma says, the unanimous decision of the Supreme Court, says that whenever we have civil proceedings where the interests involved are more than mere money, the burden is clear and convincing evidence on the government. If you also look, Your Honor, Tijani cites Zedvadis. He doesn't say much more than that, but he does cite Zedvadis. And if you read the Supreme Court's constitutional discussion in Zedvadis, which is pages 690 to 692 of the opinion, there is a wealth of citations to other due process case law governing civil detention. And one of the things that those cases say, a whole load of Addington, Fuchsia, United States v. Salerno, those cases say... Mr. Counsel, with respect, in the Supreme Court cases, you're really talking about the overriding constitutional issue, if you will. If it's improbable that you're going to be released within a certain period of time, then the petitioner has the burden under Zedvadis to show that that's the case, then the government has to refute it. So the initial burden in that case and its progeny is on the petitioner. In Tijani, our case, despite the fact that it deals with an entirely different issue, which is what's the burden of proof in a bail bond hearing, that case says that the government bears the burden of proof despite the fact that the regulations say that the petitioner has the burden. So what I'm looking for, what is the authority of our court in Tijani to overrule this obligation under the regulations? I think the court can construe the regulations that the government's relying on to not apply to prolonged detention because none of them say anything about prolonged detention, and that would be similar to what the court is already doing to the statutes. But it's a constitutional interpretation you're applying, right? It's not a statutory construction issue. You're basically saying the constitution trumps these regulations. I think you can construe a regulation to avoid a constitutional problem the same way you can a statute. The authority I would cite for that is Kuang Haichu v. Kolding, which we cite in the brief in Mr. Stewart's case. So I think it's the same issue, same rationale. I think that's how the constitutional problem with putting the burden on the petitioner where the detention is prolonged. When does it become prolonged? Six months? Yeah, I mean, you know, I don't think that the constitution has the word six months in it, obviously, but it seems like it comes from a variety of different contexts of six months. Six months, the Supreme Court says, constitutionally doubtful and dead by this. Nataraja notes that the Patriot Act also points to six months. Nataraja himself construes the statute to do six months. And in Kim, or excuse me, Damore v. Kim, Nataraja reads Damore and other courts do this too as sort of implicitly holding that six months is probably a benchmark there because they repeatedly call the detention brief when they uphold it and they note that there it's usually 47 days, sometimes five months. But, but, take all of that as a given. That has to do with the overriding issue of whether constitutionally you can hold somebody who has shown that it's improbable that they're going to be released within a period of time past the six months. But here we're talking about a bail hearing. What they were entitled to in those cases was a bail hearing in most instances. So not in Nataraja, of course, that's different, but... True. But in Tehani, they were saying, you know, go check this out. Find out whether the guy's a danger to the community, he's going to flee. But the burden's on the government. And my question to you is how does that burden get shifted there? On what authority did our court rely, impliedly or otherwise, to get there? Because Tehani, I mean, Tehani doesn't deal with this issue. This is a separate issue. I think any time you have prolonged detention, whether or not it's potentially permanent or whatever it may be, any time you have prolonged detention and it's not criminal, so it's not for a criminal sanction, the burden of proof has to be on the government. And that's, I think, the sum total of what that constitutional discussion in Zedidus, although I understand what you're saying, that in some respects it's arguably different in Zedidus, but the constitutional discussion there cites cases from a whole variety of contexts. You know, Salerno's pretrial, some of them are about mental illness and about other things. But isn't the issue due process? The court was assuring that Tehani got due process. Yes, Your Honor. Not that Tehani would be released necessarily. Maybe so, maybe not. Correct. Correct. And I think there's a serious constitutional problem with a statute that's going to let you detain somebody for six months without giving them a hearing where the government bears the burden of proof. If the government wants to give them due process for more than six months, they're the ones who have to explain why. And I think that's the best we can do on Tehani, Your Honor. I think if you held that the burden of proof was on the petitioner, certainly you'd create conflict with Tehani, but I think you'd also create conflict with this other body of civil case law. But at bottom, you're making a constitutional argument. You're saying that those two regulations are unconstitutional because there's prolonged detention and in that situation, the burden has to be on the government. I do think that's true, but I think that even if the court was only convinced that there was a serious question, you don't have to accept 100 percent of what I said, but if you think it's a serious constitutional problem, then I think you can construe the regs to, as I've said, put the burden on the government in prolonged detention cases. Your Honor, that's 15 minutes. I hope we can have the rest of the time for rebuttal. Now, just as a matter of process, is this, the way this is unfolding, the question I have is whether we should have the government respond on this case, or are you going to be picking up? I think we originally anticipated the government would respond at the end. Well, I understand. The government's okay with that? We're comfortable with that. May it please the Court, I'm Matt Adams with Northwest Immigrant Rights Project. On behalf of Mr. Prieto, and I seek to reserve two minutes for rebuttal at the end. The vast majority of removal cases are completed within six months, but the fact that the overwhelming majority of these cases comply with this reasonable time period does not absolve the government of its responsibility to provide the requisite statutory and constitutional protections to those few individuals whose cases are not resolved in an expeditious manner. Mr. Prieto's in February, he will now have been detained for three years. The government has kept him locked up for the three years while he's challenged this removal process, notwithstanding the fact that he's been in this pension for 30 years every single day with lawful status and has never violated a law. The last 14 years, a social worker for the state of Oregon. The last 10 years, working a weekend job, a second job doing outreach to the homeless. He has one misdemeanor conviction for which he was sentenced to 30 days, and that was almost 20 years ago. The government did not even argue that he was a danger to the community. In their custody review report, they conceded that point. What statute do you believe authorized, you probably don't say he's authorized now, but what's he being held under? What statute? Given that a petition for review was filed and a stay was entered by the court, our position was that 236 does not apply because there was no longer a removal proceeding. He had a final administrative order. And yet, 241 did not apply because that stay was entered pursuant to 241 AB. Do you think it's in limbo? I think it's in limbo. There is not a clear statute that authorizes his detention. I think if you have to construe a statute to authorize his detention, the more acceptable interpretation would be 236. There's got to be one or the other, doesn't it? I don't know whether there's a statute. I mean, if you look at this scheme that Congress set up where they said, we're detaining these folks because we assume all of them are going to be done in an expeditious manner, and the majority of folks are going to be removed. And even if they want to challenge or seek judicial review of that removal, they can leave the country because they still have jurisdiction. So Congress anticipated the majority of cases are going to be done. And I would assume that Congress had the same assumption that for those few individuals where the case was not completed within that time period and a stay was granted, then there would no longer be a need to detain them during that length of judicial review. Let's just take 241. 241, first of all, under 12.6 or 236, essentially, detention is authorized pending the decision on removal. Correct? That's correct. Okay. So then the petitioner gets an administrative order of removal from the BIA. Okay. Or, and if it doesn't appeal, then under Section 241 says now he's into the removal period. Correct. And it says that he shall be removed during, within that 90 days, which is what Congress seems to have in mind. But it says the removal period begins on the latest of one of two dates. The date of the order of removal becomes administratively final. That's BIA. Or, as your point as I understand it, removal order is judicially reviewed and the court orders a stay, which is this court. That's the posture in which he comes. Correct. So is it your position that during the pendency of whatever this court is doing, he's no longer subject to detention? There's no longer statutory authority authorizing that detention if a stay of removal has been granted. Correct. So at that point, they have to let him out under supervised release kind of conditions, presumably. Or make a showing, in your view, that he's a flagrant. Exactly. Or a special showing regarding danger to the community. Your client's had two hearings before an administrative law judge, right? Denied bail in 2005, then was granted bail, I believe, in 2007. Is that right? No, no. He was granted bail of $15,000 but he couldn't meet the bail. That's correct. Is that correct? And actually, during the administrative process, he had two bond hearings before the immigration judge because the first one he appealed, and the BIA sustained that appeal. Okay, so is that due process? What authority do we, as a court of appeal, have to visit the issue of what the administrative law judge thinks is an appropriate amount of bail? I would argue, first of all, that he hasn't had due process as required by this court to Johnny. To Johnny said that the government must establish that he's a flight risker of danger to the community. Well, he must have met the burden one way or another, perhaps harmless error, because the court administrative law judge granted him the right to be out on bail. So he met that burden somehow. He didn't think he was a flight risk, or he didn't think he was a danger to the community. He would never authorize bail in the first place. What he did was set bail at $15,000, which apparently, according to the record, he knew this defendant could not meet. What's wrong with that? There's two points. One is, given that the record demonstrates that the immigration judge understood he couldn't pay a bail, by setting a bail, that was the equivalent of setting no bond. He knew that this individual would not be able to pay the $15,000. It was simply another mechanism to prevent his release and to prolong his detention. There's many mechanisms that the judge could have used. He could have said, all right, I still have concerns. I'm going to require his release pending electronic monitoring, or I'm going to require in-person reporting. There's a whole bag of tools that the government uses with certain cases when they issue release on conditions. How much could your client afford to pay? As we presented to the court, he didn't have any funds at that point, three years later. If the IJ had said, I'm going to require a $500 bond, in your mind, this would still be an abuse of discretion or certainly a miscarriage of justice by your perspective? In this case, we argued that if the judge said what the judge believed was the minimum bond, even though our client couldn't get that, at least we'd have a chance of getting a charity organization to try to raise those funds. Sometimes that happens on a practical matter. But where the judge said it ten times the amount of what the judge believed was the minimum, then clearly the purpose was to prevent his release. Okay. Again, what is our authority as a court of appeal to second-guess the IJ in this case? What's the basis of it? What must be first and foremost here is this is a habeas petition. This is not someone who's seeking judicial review of one of those initial two administrative bond hearings. So the authority of this court is its standard authority in reviewing any denial of a habeas petition. The district court denied a habeas petition after the immigration judge issued this bond. But the immigration judge's bond hearing was part of the habeas petition. That was the reason that this court could have just as easily held that hearing as it had ordered the immigration judge to hold that hearing. And what did the IJ do wrong in this case? The immigration judge did three things wrong. First of all, he placed the burden on Mr. Prieto to demonstrate that he's not a flight risk. And second of all, instead of looking at the individual facts, he made a legal error that contradicts the holding of this court to Johnny, saying that a person who has a final order and is seeking judicial review is automatically a flight risk. And instead of doing an individual analysis of the facts. And third, the immigration judge then set a bond, which was the equivalent of setting no bond, which required Mr. Prieto's ongoing detention since he had no practical means of paying that bond and the immigration judge didn't. In my view, he should have either ordered him released on whatever conditions that were available, like electronic monitoring or requiring in-person, or he should have set a bond that at least counsel represented we'd have an opportunity for a charitable organization to raise. In this case, the government it should be noted that at that custody hearing, the government did not even present any evidence that he was a flight risk. And like I said, the government had already conceded he was not a danger to the community. And I see that my time is coming up, so I seek to preserve one more minute for rebuttal. Thank you. May it please the Court, James Fyffe of Federal Defenders on behalf of Mr. Casas. Your Honor, the question here is really straightforward. The government's not arguing that Tijani and Naderaj were wrongly decided, simply that they don't apply to these cases. But Mr. Casas clearly falls within the parameters of these cases, as showing that he has been unreasonably detained for six years, twice as long as the nominal sentence imposed in his criminal case, three times as long as the actual time he served on those cases, twice the time that was found excessive in Tijani, and two years longer than the term of detention in Naderaj, which this Court said was plainly unreasonable by any measure. Moreover, he raises three substantive arguments in his challenge to his deportation. One of them, which the government has conceded is meritorious. Another, the government has admitted he does not have the documentary proof to sustain his burden. And in the third one, which it doesn't respond to at all. So Mr. Casas has shown he raises tolerable claims to his deportation, but he has been detained for six years without any chance for release. What exactly does your client want? Mr. Casas wishes to be released, which is the relief which numerous of these cases precedents in this case have given. He wants to be released as in without any kind of a hearing. He just wants to be released because of the time that he's spent in custody. That's correct, Your Honor. Not completely just cut loose and throw down on the street. He acknowledges that he should be subject, as the Vida says, to the usual and appropriate conditions of supervision as any of the other 16,000 deportees which ICE supervises. There's a number of remedies that have been made available in the case law, and that makes sense because these are all review of habeas cases. And habeas cases can craft the appropriate release. It's not simply release and that's the only thing. There could be conditions applied. But release has been seen as the underlying relief which is granted on the habeas petitions. Vida puts that out with conditions. Judge Tashima to Johnny said that he, in his view, the relief should have been released forthwith. Madaraja gave release three times over. It gave release based on the habeas. It gave a release based on ordering that he be admitted to parole. And it also gave him release based on his motion under Rule 23B for bail. He was released three times over. He couldn't emphasize stronger that the relief is release. Moreover, as Judge Smith is pointing out, that there is a condition where the length of detention means that there is no point in going to any further procedure. A sliding scale of... Are you ready to tell us what the bottom line should be in our ruling, in your view? Yes, Your Honor. I think that Mr. Kossuth has been detained for such a long time and there is such a minimal showing of any flight risk or danger that he should be released under the normal conditions of supervision as appropriately applied to any detainee that ICE is supervising. And just to give you an idea of that, because if I can just... The Corporal embellished me. So what authority would we be doing? Under the authority of habeas relief. The basic relief under a habeas case is to  case. And as Judge Smith points out, this could be released under reasonable conditions. And the reasonable conditions would be the usual and appropriate ones which apply in numerous thousands of detention cases. I've been doing these indefinite detention cases for two years. It's half of my caseload. I've had scores of these clients who have been released. In fiscal year 2007, our office had a 90% release rate of our clients. Less than 10% of our clients were either removed or their cases were terminated some other way. 90% of our clients get released from ICE under reasonable conditions. And Mr. Koffes is one of them who has been denied release repeatedly. And yet when you look at his case compared to some of my other clients, the regulations have a special concern for violence. Within two subsections of 241.4E, the regulations refer to a history of violence three times. Mr. Koffes has no violent convictions at all. In fact, as the district court said, not now, not ever. He's never been violent. And yet I have had clients released with such violent convictions as aggravated assault, assault with a deadly weapon, solicitation of murder. And just to give the court a concrete measure, I brought my client's commission to do this. A client recently was released. This is his order of supervision. Similar to parole conditions in a criminal case. Just boxes which ICE checks what his conditions are. He was released on November 9th of last year. And he's got the usual conditions, the standard conditions, report in, not to travel outside California, attend a medical exam if ordered, etc. There's one special condition. Comply with all parole requirements. That's because Mr. Gil was convicted of attempted murder. He was in ICE custody for four months and then was released on an order of supervision. Mr. Koffes has an expunged misdemeanor from 14 years ago, a felony auto burglary from eight years ago. That's his total criminal record. The district court found that he has never been a threat to violence. And yet he's being held for six years with no chance of release. Let me ask you this question. Your client is a very compelling factual situation, but we may as well use your case as the basis for discussing something that overlies a number of these issues. It's the government's contention that when a petitioner files appeals, seeks relief, gets stays, and so on, that in fact that that is an act that basically makes it so they can't leave the country, and therefore that ought to be told, if you will, in terms of the time that someone is held. What is your position on that? Your Honor, I think that I cite some of the cases in my briefs that point out that simply pursuing your legal remedy shouldn't be seen as an act of obstruction. In fact, Judge Hatter in the Martinez v. Gonzales case, which I cited to the Court, found that precisely. We're talking about the Pellich situation, where Pellich is someone who has lied to immigration about his origins. These are people deliberately obstructed. There's nothing like that in this case. From your position, the fact that the government cannot remove someone because the stay is in place, you don't buy the argument that they hold the key to their own release by being removed. No, Your Honor, for two reasons. One, as Judge Hatter pointed out in Martinez, the fact that this Court is not obligated to grant a stay. And in fact, I have a client where this Court has denied a stay because well, they simply find that there's not enough substance to it to grant a stay. The Court can deny that and does deny them. So the fact that, as Judge Hatter observed, that well, if the Court does grant a stay, that at least means that it's not frivolous and dilatory. This Court would have found otherwise. But I think that the real answer is exactly what Judge Tashima pointed out, and to Johnny, is that there is a standard. It's not simply, if you file an appeal, you get an automatic stay and you get to release. You have to show that you have a substantive argument. And I think that's a reasonable requirement to be made in the District Court, to show that you have a substantive argument and that your delay has  for example, that it's Bolivia v. Appeals in the eye of the judge, I suppose, at some point. But let's just say that somebody is effectively represented like in your client's case. You're a fine lawyer and you know when to file these things and by golly, there's never a chance this person's going to leave the country because you've always got something up before some court. You're always seeking a stay and during the entire period that your client is in custody, there's a stay and the government can never possibly remove the person. What's your take on that? Is that a is it reasonable to say the government is acting improperly, keeping somebody there or nonetheless, they should have a hearing, be entitled to a bail hearing, be able to get in your case, a supervised release, regardless of what's going on in terms of the appeal, unless the government, say, acts in good faith and does something like that? I think, Your Honor, what I would argue for is exactly what happened in Mr. Costa's case and what should have happened is that if you have a stay and it's been prolonged, the detention has been prolonged because it looks like it's going to take quite some time to decide the issue, that he can go into federal court and say, look, my detention has been prolonged, but I'm raising substantive issues, which a district judge can, in his sound discretion, determine whether there's a stay. Yes, these are reasonable issues. I think, as Judge Kishima said, they deserve a closer look. So the issue is not whether there's a stay, but rather whether the appeal is meritorious. Correct, Your Honor. In fact, I intend to argue that exactly in my case where the court has denied my client's stay, but it doesn't matter that there's not a stay because, in fact, even though there's not a stay, the government has not been able to remove him. They aren't able to get travel documents, so he's nonetheless stuck in custody, even though there's not any official legal reason why he could not be removed. He should not remain in custody otherwise if he shows that he has a substantive argument. In this case, the client has a tax claim, and that would be a very substantial argument if he's able to sustain that. So I don't think that the stay is one good reason. I mean, because that's at least a judicial determination that this argument is not frivolous and dilatory. There's been some gatekeeping already so that when the client comes into the district court and says, here are the reasons why I think I raised culpable claims that are sufficient that I should be released under appropriate conditions, then there's no reason any more than we withhold bail in such cases in criminal cases. Okay. Thank you. Good morning. May it please the Court. Tom Dupree on behalf of the United States. I'll be presenting the government's argument in the first case, the Dioff case. And my colleague, John Gymchai, will be presenting the government's argument in the second case and the third case, and then I'll present it again in the final case. And with the Court's indulgence, I would also like to reserve five minutes for rebuttal if permissible. I appreciate that, Judge Fischer. Let me get right to the issue of indefinite detention, because I think that is a theme that encompasses all four cases presented for decision today, and the petitioners certainly spoke at length about it in their presentations. Simply put, this is not a case of indefinite detention. Let me ask you to indulge me first, and just go to Section 241. If we can just understand the government's position on what these sections, how they play out. As I went through with one of the counsel for petitioners, as I understand it, the government, once it commences a removal action, has authority to detain for some period of time. That's the fundamental design. Okay. The way, at least, it unfolds in Section 241 is that while, until there's a final order of removal, whatever authority the government has, may be subject to limitations, as I'm arguing for here, but at least Congress has gone through the statute and provided that once the removal period begins, there are certain statutory consequences and authorities that flow from that. I think that's right, but if I go back to what Connor said at the end, when the removal period begins, and I think that really may get to the essence of the disagreement of the two sides here. That's what I'm trying to get to. I'm just taking the language of the statute. The language of the statute says detention, release, and removal of aliens ordered removed. So, up until that point, they're being held under the authority of what, Section 242? It's 236, and then it becomes 241. Okay, right. All these numbers, some are using 1223. All right, so there's an authority pending the decision to remove, an authority to detain. That's exactly right. Now we're moving into the removal period. Now they've gone through the process of getting, they've gone through the IJ process, they've gotten to the BIA. Okay, now Congress has provided, if the BIA enters a order of removal, and it's not appealed, then this removal period starts. Correct? That's right. And if the, if the alien does appeal to this court, or a circuit court, and a stay is granted, then there are provisions that deal with that. The removal period begins, or has to await how we dispose of it. Correct? That's right. The removal period would be tolled during the tendency to stay issued by this court. It's just tolled, it doesn't begin.  that removal period begins on the latest of the following. Whether you call it tolling or whatever, I'm just sticking with what Congress told us. Okay, so it begins either on the date the order of removal, that's the BIA order, becomes administratively final, or if it's reviewed by us and we grant a stay, then they wait and the removal period will begin once we issue our mandate. Well, if I could take issue with one small portion of what your Honor said, and I think the Dioff case actually provides an excellent example of this. In Mr. Dioff's case, the Court will recall, he was found removable or granted voluntary departure back in 2003, and his removal order became administratively final when he failed to show for voluntary departure. So at that point, the removal period began, and so although he certainly received a stay from this court, I don't think it would be correct to say that the removal period in Mr. Dioff's case began in 2005 or has never begun because the stay is still in place. The removal period began, it was running, and then it was pulled upon issuance of a stay by this court. So I, and I think that also gets to Judge Smith's colloquy earlier about whether there's a lacuna between 236 and 241. The government's interpretation resolves that problem because under our view, the clock starts ticking as soon as you have a final administrative order of removal in place. It may be told during the pendency of a stay issued by this court, and then upon the dissipation of a stay, it begins anew. That's the one way that you can recognize... Let's say hypothetically that the stay goes into effect one second after the administratively final order is entered. Would it ever begin until that stay was, would the removal period begin until that stay was lifted? I think it would, if I understand Your Honor's question correctly. As long as there is some time in which you've got an administratively final order of removal, and there's some time elapsed before the stay is entered, yes, the removal period would begin during that time. That's a strange reading of the statute. But I think, well, I respectfully disagree, Your Honor. I think our reading, not only is consistent with the statutory text, but I think it avoids the, if I may say it, absurd results that the petitioners are urging this court to adopt. Okay, so what you're doing is you're saying it begins and then it unbegins or is told, not being the language of the statute, but taking that concept, so in any event, we've now shifted into a Section 241 regime. Once there is a BIA order, final order, even if there's a second in between that and the stay, the removal period has begun. That's exactly right. Okay, so now, at least we have a statutory structure on detention authority and rights and remedies that governs. No lacuna, we're all clear. Okay, so let's say we go with that. All right, then that says that you have, the government has 90 days. It's used up, let's say it's used up five days before the Ninth Circuit butts in with the stay. All right? Okay, so now it's told. So you've got 85 days in which to act. And then it'll, the clock will start ticking when our mandate issues. When the stay is final, yes. Okay, when it's final. All right. So then the detention authority is circumscribed by the very terms of the statute. It says, as I understand it, you've got two, the government has two ways to extend detention. One, it can extend the 90-day period through subsection C, or it can prolong it, extend it under subsection 6, which is the flight risk process, correct? That's right. Otherwise, the presumption is, or the statutory structure contemplates, the person will be put on supervised release. I think that's right. Okay, so we're all agreed there. So in order to respond to the concerns of petitioners who have presumably all come in under section 241, in your view, to assess whether they are being properly detained beyond 90 days, we should be looking as to whether the government has complied with either suspension, Congress calls it failure to cooperate section C, or is a flight risk under subsection 6. I'm skipping a whole lot of intervening new ones. I would characterize A1C not as a failure to cooperate section, but as the act to prevent removal section, because I think that's exactly what's going on in this case. So, on that point, you think that if an alien seeks judicial review in a non-frivolous manner of his underlying detention, that that somehow tolls the 90-day period? Absolutely. And that's the funny language of A1C. A1C says, if the alien acts to prevent removal, I can't imagine Congress speaking more clearly on that exact point. So you think judicially appealing, seeking judicial review, is what Congress had in mind? Absolutely. Okay, and what's the authority for that, other than just that you picked up... Well, the plain fact that the statute, for one thing... Conspires or acts to prevent the alien... Acts to prevent removal. I would say filing a motion to stay removal is an act to prevent removal. I don't think the English language can be contorted as the petitioners would suggest, to say that when I file a motion with the circuit court saying please stay my removal, I haven't acted to stay my removal. I think this is a plain language analysis on that point. I would point out that the 11th Circuit has agreed with that. The 11th Circuit in the Ockenwald case agrees 100% with that analysis. They say when an alien files a motion for stay of removal, absolutely that's acting to stay removal, to prevent removal. So I think that is a result that is compelled by the plain text of the statute, and again it's consistent with the way at least one other circuit court has approached the issue. Let me say a few words if I could about the indefinite detention point. In Zavitas, the Supreme Court characterized indefinite detention as one in which removal is not practically attainable, or one where detention is potentially permanent. And I think that in the circumstances that obtain here, where these aliens have all attained stays of removal pending a decision by this court, it is clearly not the case that removal is not practically attainable, or that their detention is potentially permanent. I think Zavitas is addressing an entirely different situation where you did have people who at least in theory could be detained permanently, whereas in this case these aliens are simply awaiting a decision from this court. You're saying that Zavitas does not apply in a 241 situation? Well, I would say it applies in a 241 situation if you have a Zavitas-type situation, namely one in which we are prevented from removing someone because we can't find a country of origin to which to remove a person, or there's a problem obtaining travel documents, but in a 241... That's not exactly what the court said, is it? It just spoke in terms of a practical result, whether there was an indefinite time period that was unrealistic. It was going to be resolved in any short time period. But the language that the court used to characterize that situation is one in which it said removal is potentially permanent and not practically attainable. In this case, certainly in the case of Mr. Dioff, we are ready, willing, and able to remove Mr. Dioff to Senegal as soon as this court lists the stay. So I think to suggest that removal is not practically attainable I think simply doesn't comport with the facts of his case, nor with the facts of the case of the other petitioners. I would point out that in the Bakir case, which granted an unpublished decision of this court, this court agreed with our point that in a case where you have a pending appeal, detention is not potentially permanent. Let me tell you, if they chose not to publish it, even if it's our court, that doesn't carry a whole lot of weight. They thought it was... It may even carry a negative weight. Otherwise, we wouldn't be spending our time doing that. Let me address... I don't want to move to another authority. Well, the other authority I have on that point is the Soberanus case, which is the Tenth Circuit. The Tenth Circuit in Soberanus specifically held that when you have a pending court decision, the detention is not open-ended, the detention is not indefinite. The court said, for now, the petitioner's detention is clearly neither indefinite nor potentially permanent like the detention held improper in Zabidas. It is rather directly associated with the judicial review process that has a definite and evidently impending termination point. So I think the Tenth Circuit's approach there, too, dovetails with this court's unpublished approach in Zakir. Before... I think the basic disagreement between you and the other side, they assume that unless the detainee is either flight risk or a danger to the community, he should not be in detention, he should be released. Regardless of which statute, regardless of the particulars, he should be outside.  position, as I understand it, is he could be outside, he could be at home, he could be going to his home country if he hadn't decided to bring certain actions that, in your view, interferes with his proceeding. And how do we resolve it? How do we resolve it, and on what theory? We must now write, and we must say that either the question of whether he is a flight risk or unsafe or a danger to the community is not pivotal. What is pivotal is that he could be on his way back to his home country, but for actions that he's taking, in your view, to delay his removal. They are suggesting that he's not taking those actions, as I understand that position. They're just saying he can take these actions outside. He doesn't have to be detained while he takes them. So what do you say? Well, it's a good question. I have two points in response. The first is that I think it's important to note that DHS does provide post-custody or post-order custody determinations where they assess things such as dangerousness to the community or flight risk. So I think that a decision of this court holding that these petitioners are detained under 241 would not prevent them from having individualized assessments as to dangerousness as to flight risk. How do they get that? Was that consistent? Do they get a personal interview? They absolutely can. And it's granted as a matter of course? They do not have a right to an interview as a matter of right. It's just a matter of the DHS looking at the file and on the paper deciding whether or not in the district director's view it's a flight risk? Well, the initial review is a final review which is done on paper and the DHS official reviews any submissions that the petitioner wishes to furnish for DHS's consideration They have a right to a lawyer or a representative to participate in the process. They're given advance notice of when this review will occur so they can marshal their evidence. Then they get the individualized assessment that may include an interview. May include an interview, absolutely. Then subsequent to that It is with one caveat and this goes into the DHS regulations. Subsequent to the initial determination there are provisions whereby once an individual has been detained for I believe it's one year or so there are provisions where they go to a two panel review board that makes the determination and if there's disagreement there's a right to a hearing. I don't want to say without qualification they never have a right to a hearing. What's the earliest point at which a detained petitioner who is pursuing a non-frivolous judicial review of a BIA order gets to have a personal confrontation with the decision maker as to whether or not he constitutes a flight risk that would justify keeping him in custody as opposed to being in his community. I think it would be after the initial removal period had run so I think it would be after several months but I do think it seems to Are we talking three months? A year? What? Well, the difficulty is that I think DHS has the discretion to conduct certain hearings at various points in the process. It's not the discretion of the DHS. It is but with an outside limit. It's not a Tijana hearing. It's not a Tijana hearing. The next part of it then is who has the burden at that point to show whether or not he's a flight risk? Well as Judge Smith correctly noted the burden rests with the alien. That is provided for under the regulations squarely. So if we follow the regulations in your regime he has a there's some discretion on the prosecuting agency to grant a personal interview and to make a decision in which the petitioner has the burden to establish that he's not a flight risk. That's right. And we should in assessing that should we be worried about constitutional implications for that? Well I don't think this Court needs to worry about that because I think that while the Supreme Court has emphasized in certain contexts at least the importance of an individualized assessment, that doesn't necessarily translate into an actual full-blown hearing. I think one point that united all members of the Supreme Court in its detention decisions such as Kim and Zabihas was to the extent there may be some sort of due process interest that rests in having an individualized determination. By who? And it can be by an administrative official. And it's that right to an individualized assessment that is fully vindicated by the DHS regulations. This is not a situation in which DHS is saying an entire category of individuals is taken off the table. They're giving individualized assessments. In Mr. Dias' case, he presented evidence. There was a reasoned decision. So I think to the extent that the Court is concerned about any kind of... What happens if the DHS official makes what is a blatantly wrong decision? There's no judicial review. And you don't think that raises a constitutional issue? Well, to be sure, there may be judicial review available in habeas if there are constitutional claims. Obviously, I know that this Court and the Real ID Act preserves jurisdiction over those types of claims. But I think in the typical case, if an alien's complaint is simply that DHS misadjudicated his level of dangerousness or his flight risk, I don't think that is something that is properly cognizable by this Court. And I don't think the Constitution... Even on habeas? Well, if they're not... I may specifically survive that the Attorney General and DHS's determinations as to bail, release, those are not judicially reviewable. So, again, absent some narrow type of claim, I simply don't think there would be jurisdiction in this Court. And I don't think that's a remarkable result. I don't think due process requires any more. One more thing before you sit down. Mr. Johnny, the Court ordered an IJ to conduct a bail hearing when you were in the post- 1231. Does the government have a position as to whether there was any statutory basis for that order? In 236, it's a different matter. It's all set up there. But I can't find any statutory or administrative basis for an IJ hearing, as opposed to a district court hearing, or a bail hearing when you're in 1231. Do you know of any such authority? There's absolutely no authority for that. So it's just out of whole cloth. That's exactly right. Good morning. John Unshie on behalf of the United States Attorney General, both as appellant and appellee in the cases of Mr. Seuss and Mr. Prieto Romero. Certainly the cases that I'll be discussing today obviously bring up the same issues, and to the extent that perhaps I may add further clarification with regard to what the Court's main concerns are. That is, we believe that it should be what the statutory structure requires of detentions of individuals that have stays of removal. I want to start out by saying that the government's interpretation I think is certainly sound. In one provision, really by any court, is one that we cite to 1252 B-8 that talks about the fact that the Attorney General has the authority, keeps the authority to detain an individual under Section 241 after final order of removal. And that provision is really the only bridge in 1252 B-8 that serves as a bridge between the judicial review provisions within specifically the subsection that provides that this an alien's removal pending the adjudication of the petition for review. That subsection is the bridge, 1252 B-8, is the bridge between their judicial review and 241 detention. That is the only statute that connects those two explicitly. So I would, of course, the Court has already taken note of that. So that takes us into the realm of, in the government's interpretation of, because we believe Congress has mandated that when there is a stay of removal, and even though there is a stay of removal, the Attorney General can detain an individual under 241, where are they detained under? The government's interpretation, as Mr. Dupree just described to the Court, is that that individual is detained under 241 A1C. The reason for that is because the stay is an act. But more importantly, because that section provides that the Attorney General may detain an alien under 241 A1C, rather than requiring mandatory detention that the removal period requires. So because that provides for discretion, that's why the government has stated in its briefs, these individuals do get those post-order custody reviews. It's not a situation where, quoting from Zabidas, where we're concerned with somebody being condemned to an indefinite term of imprisonment within the United States. That's not the case here. The government's intent is to provide individualized reviews, albeit under Section 241. Now, moving to the case of Mr. Stoweth, I think it's important to note here, the same situation. There's a stay of removal in place. Mr. Stoweth was not detained until after he filed an asylum application with the agency administratively. And then only after the immigration judge denied that asylum application, after the board reviewed and denied the application itself, after this court then reviewed and affirmed the agency's decision essentially, after a petition for cert was taken to the Supreme Court, the Supreme Court denied it, it was only after that period in time that Mr. Stoweth was detained. So it was after there was a final order of removal as judicially reviewed from the administrative level all the way up to the Supreme Court essentially. At that point is when Mr. Stoweth was taken into custody. And at that point is when Mr. Stoweth filed the second motion to reopen, which fairly recently, I believe it was October, the end of October, this court affirmed the or actually denied in part, dismissed in part the denial of that motion to reopen in asylum context. So we won't go into the details of which statute controls, but once again, that would be 241 A1C in that situation. Now, the other case that I would like to talk about... What actually kind of review did he get? He got a post-treater custody review. What did that consist of in his case? It was as Mr. Dupree was discussing. It was a file review under section ACFR 241.4. That's what he received under the post-treater custody review context. Of course, Judge Hatter ordered that by way of his... Later on he got, yeah, through Judge Hatter, but through the administrative side of it, under the regulations, he got an annualized update. And that was it? No, Judge. He received a file review in January... He was detained in September 2004. He received a review in January 24th of 2005, as well as April 27th of 2005, and as the regulations provide, April 27th of... So he got the annualized updates? Ultimately, yes. And did he ever have a personal interview? No. He did not, Your Honor. Okay, and what was the reason for that? We were just told that at least within a few months he'd get a personal interview. Well, as I understand it, Your Honor, that is a discretionary... I think Mr. Dupree did say that it's a discretionary decision that he gets the personalized interview on a particular... So in this case, we can use it for the proposition that that may mean he doesn't get one over several years. That's correct, Your Honor. And in terms of... And I  on him to establish he wasn't a flagrant. That's correct, Your Honor. And I think what's important and significant in these cases is to bring up Tijani. At the outset, Tijani distinguished its holding from DeMore v. Kin by saying, this is a different situation. We're talking about someone here that did not concede their removability from the United States. In other words, did not concede whether they have the right to even be in the country to begin with. That's how this court distinguished Tijani, or rather DeMore v. Kin. The situations here are individuals who have been adjudicated by the agency and up through this court. The conclusion has come that they do not have the right to be in the United States. Certainly, there are challenges still pending as to whether or not they have relief from removal, but that's different than what Tijani was considering in distinguishing itself in the majority opinion from DeMore v. Kin. I think that's an important factor to consider when we look at the type of proceedings as well that we're getting into. The post-order custody reviews are set up as delegates of the Attorney General and Department of Homeland Security to handle individualized determinations of individuals who have been ordered removed as opposed to IJ bond hearings of individuals where we haven't reached that determination yet. You know, I don't want to interrupt your presentation, but before you sit down, I wish you'd tell us what, in your view, should be the bottom line of any decision that we make on these cases and the reason for it. Well, Your Honor, this is a great time to do that, I think. I think that... You're not going to say the unpublished opinions, are you? No, Your Honor. No, I'll do that right now because I see our time is going down, but without saying any unpublished decisions, I think that there are two important distinctions to be made. First of which is this is not... these cases do not involve indefinite detention as discussed in Zabidas and contemplated in Zabidas. To be clear, Zabidas talked about prolonged and indefinite detention. I noticed that today during argument, they dropped the indefinite part from their position and just said prolonged detention. I think that's very significant. These are not cases that involve someone being condemned to prison. So, that brings us to what is it that the government... Wait a minute. They are in prison. They can't leave. They're confined. They're in jail. But I think the terms that Zabidas was discussing was the indefinite duration of that detention. Right, but you just said they were in prison and I'm just wondering how you get to that. They are in prison. They are detained at this point, but to the extent that I said that they are not detained and bespoke, they're certainly detained. You said they were condemned to prison. Correct. They're just in prison. They're detained. Condemned, I think, is taking the key and sort of tossing it out, which is what Zabidas was concerned with. They're not suggesting they want to be there. Well, Your Honor, certainly nobody would like to remain detained, but I think it's important to note that in certain situations, there is a choice. You know, the Levers-Hanson case is discussed as authority to the prospect that even before final order removal, you look at the reasonableness situation and the assessment is considered as to whether or not the person is ultimately going to be removed. In this, in Levers-Hanson, that individual could not be removed to Vietnam. The court distinguished that individual does not have the option of taking himself out of prison or detention and going back to Vietnam and litigating his petition for review. That individual was stuck unless the government released him. In these situations, for example, Mr. Prado-Romero, he certainly could litigate his petition for review. Congress has made clear in the statute that individuals may do that from abroad. Mr. Prado-Romero could certainly go to Mexico and litigate his case from Mexico. Realistically, counsel, it is hard enough for aliens to get representation as it is. Isn't it almost a fantasy land to think that somebody is going to go back to Ghana or Mexico or wherever else and be able to continue to litigate their case when they are not here anymore? Congress certainly must have considered that when they provided that to be the case. Has Congress specifically considered that issue? Well, there is nothing that I can point to other than to say that Congress is speaking to their right to the appellate side of the petition for review before a circuit court that they can be removed and then litigate from abroad the appellate aspect. I realize that Zabidas and the bail hearings and so on are at really two different levels, but ultimately what is driving these folks who are representing the aliens is that the two Supreme Court cases that immediately dealt with this talked about situations of, you know, they thought they would be done in four months or whatever. They thought, well, presumptively six months is okay. I have a little chart that I created here for the five parties we are talking about today. Since the order, the final order of removal became effective, we have got in the last 20 months, probably going from there, Prieto-Romero two years and two months, South two and a half years, and then Casas-Castrillon five and a half years. These are very extensive periods of time, well past the Zabidas framework. I realize the court was there talking in a slightly different context, but surely the government can see why this is a troubling issue from a civil liberties perspective. That is what we are having to wrestle with here. Nobody wants us to get into constitutional areas, but in effect that is what the Supreme Court said is, we want to avoid the constitutional issue, but in order to do that, we have to construe the statute in such a way as to avoid these extensive indefinite periods. Arguably, if you take the government's point, that if somebody had some really good litigators and they could just keep going and going, they could be in jail for 20 years while they are litigating their position. Isn't that right? That is correct, but I don't think that precludes this court from concluding that, given those concerns, that the requirement must be that these individuals get individualized custody determinations while they are litigating their case. The fact is, we have four individuals here in court, cases in court, but there are definitely, obviously, there are tens of thousands of people in this category. There are individuals who have been released after custody reviews, of course. I think that gets into the... We have heard an argument today that, it is outside the record, but the nature of these cases is sort of wander there anyway. He says, wait a minute, I have lots of clients who have worse records than my client in this case, and he is not getting released on his own, you know, under supervised release terms, and yet the government's ICE is letting them out, DHS is letting them out, somebody who has got basically a worse record. Well, Judge, I think that just goes to show that the system works and isn't set up in a manner to preclude individuals from being released. Well, you think it works and he thinks it's discriminatory. It's just irrational. And that's why he... And your colleague says, we have to take your word for it, because we don't have any authority to review it, to find out whether, in fact, there is merit to it. Well, Judge, my colleague is correct to state that there is no authority to review the discretionary determinations, but through the habeas corpus... Well, there is, as long as there is not a due process element. We have that jurisprudence, too. We can... To the extent that you kind of are trying to say, don't go there, because it's all hunky-dory, but in fact, we do have the authority to review constitutional claims, and if you want to push us into a constitutional determination, then that's where we have to go to find out whether or not this regime that you want us to construe as allowing the government at its discretion, unrevealable by any court, to keep somebody in custody while he's pursuing a good-faith, meritorious claim that the BIA, the IJ, made a mistake in ordering them removable. Your answer to that, as I understand it, is, no, Congress made that decision. It said if you conspire or act, we should read that as saying that encompasses normal judicial review that you're entitled to, and that gives you authority to extend the removal period as long as the government gives him some modicum of review, unrevealable by any court, and that if he wants to not cool his heels in the detention center, which is costing the government a lot of time and money to maintain, he can go ahead, drop his claim, I think maybe Fofana may have done that, I don't know in that case, and go ahead and litigate from afar. That's the government's position. Again, Judge. Not quite stated so rhetorically, antagonistically. Correct. I think if I could, I was hoping you were going to get back and give me your answer in a nutshell. Can you do it? Yes, let me give it to you in a nutshell. The statutory structure is set up in order to avoid any constitutional concerns. The government is of the position that individuals who are detained should get individualized custody terminations when they have a stay of removal pending petition for review in a circuit court. The government's position is that Section 241 of the Act provides for that because the stay of removal is an act that prevents removal, therefore triggering 241 A1C, which says the Attorney General has discretion to detain those individuals, therefore the 241.4 regulations come into play where you have the individualized determinations at the earliest, at the three-month mark, 90 days after their order of removal is final. It's been determined that they are removable at the administrative level, at least. And that those custody review provisions are sufficient and because certain individuals may remain detained thereafter, shouldn't lead this court to the conclusion that the government does not release individuals or that an individual does not have the right to seek review under the habeas corpus, not as to the discretion and determination, but certainly if the review is conducted in a manner that would reach constitutional problems, given the government's interest in having someone detained so that they're available for removal at the time of removal and whatever liberty interest that removable individual has at that time, if those constitutional issues surface in an individualized case, not as systematic a privilege, then the court can address that, the district court can address that. Addresses that through habeas. Through habeas. As was the case in Deuff and Sooth. That's correct, Your Honor. Okay, so that's the safety belt for abuse of constitutional abuse of discretion. Absolutely, Your Honor. And the other side, as I understand it, would say there can be some restrictions on their liberty, they just can't be detained. Well, Your Honor, with the other side, that discounts the government's interest in keeping someone detained so that they're available for removal, and it's not a bright line rule that if there is a final order of removal, one will be detained until they are removed. Certainly, there are different factors that, under 241.4 F, that the official is supposed to consider, family ties. In fact, the record has these post-order custody review worksheets where there's a checklist that the officer goes through, do they have family ties, is there a criminal record, and then they give their ultimate conclusion as to whether the person should remain detained. And certainly, to start out with, in discussions of Mr. Stokes' case, as he only had a minute here left, but really quickly, just to sum up, the six-month per se rule would completely eviscerate the statutory instruction that we have in place right now that the appellants slash appellees would like to see here. And certainly, from a logical perspective, if you take the situation of someone who's subject to mandatory detention, they can be detained lawfully for four months on a de mortem or longer, that's an average, but let's take the four-month average. If they get a final order of removal, they can be detained another 90 days mandatorily, three months, that's seven months right there where they have no right under the Constitution or under the Supreme Court precedent to any review. So the six-month approach really must be disregarded, and the statute is what you control here. Now let me ask one more question, and that is on habeas review, you suggested, Mr. Sooth, got all of his administrative process. Can that be reviewed by a court of appeal? In other words, if the argument is that we have a statutory structure, it's in our discretion, the bottom line discretionary decision is not reviewable, is the manner in which the petitioner was actually treated reviewable to make sure that it's complied with its own rules? Sure, for the habeas statute, Your Honor, that would be reviewable because it's a challenge to detention, certainly, and whether or not it's lawful, and the government's position would be that it would be lawful under the statute and those regulations, so certainly that challenge could be made. All right. I see we have 10 seconds left for rebuttal, so Actually, Your Honor, you're negative. You're in the unpublished opinion territory. We'll see if we need more. Now, how much time are you anticipating on your side? If you used to work for the government, you're sort of adding time on it. So, collectively, how much Okay. Okay, so We're going to take a short recess, and then we'll come right back. Okay? Don't come up and read, because you're going to I can't read it. Thank you, Your Honor. I just want to make a first point. Judy Rabinowitz, appearing before Mr. Joof and Mr. Soto. Reverend Soto. The first point that I want to make is that the government is essentially re-arguing issues that were already decided in Tijani. I was actually one of the counsel in Tijani, and some of these same exact issues came up, meaning what statute applied, what's the effect of a stay, does the hearing have to be before an immigration judge, and how is it resolved? Essentially, the government said this isn't under 236, it's under 1231. Tijani still said it was under 1226, or implicitly. They didn't actually decide it, but implicitly decided that. In terms of the stay, Mr. Tijani had a stay. They didn't say, well, your detention is therefore constitutionally permissible because you have a stay. They said, no, this is constitutionally problematic, and you either have to be or you have to be in the hearing. In terms of who conducts that hearing, I think it's really important to note that the government filed a motion to clarify the Court of Appeals order and asked that the hearing could be before an administrative officer instead of an immigration judge, and the court rejected that motion. They decided not to clarify it. We have to go based upon what's in the public opinion, and that is cryptic at best. Right. It is cryptic, but it still is. There's no dispute that the statute that authorized Mr. Tijani's detention was the statute that authorizes detention when a stay is in effect. And so... Which one is that? Well, we believe that the better reading is that it's 1226. Aren't you stuck with the facts of Tijani? Otherwise it's dicta. Tijani was being held under what? Well, I think that what the court said to Tijani was that 1226C couldn't authorize detention of that length, and so it construed 1226C as only authorizing expeditious detention of proceedings through expeditions. Because his proceedings weren't expeditious, it wasn't authorized by 1226C. What I read that as saying is it was then authorized by 1226A, which is the default statute, which applies if it's not mandatory detention, and under 1226A the statute says may detain, and the way it has been implemented by the government, there are regulations that provide for immigration judge hearings. And so therefore, what Tijani was saying, under 1226... Again, I understand I'm reading into this. It doesn't say it, but I think that this is the most plausible reading of what the court was doing, was saying under 1226A you get a hearing before an immigration judge. And in that way, the court could avoid the constitutional problem of saying there's just no way to detain this person for this length of time without adequate procedures. I think the other point, and maybe this is just too obvious, but the government's position that the only kind of detention that's indefinite is detention that's permanent was clearly the same thing in Tijani. Nobody suggested that Tijani's detention was permanent in the same way as in Guadalajara, but that doesn't mean that it was still not subject to constitutional constraints. And the essence of the government's argument is, unless detention is potentially permanent, it's not subject to constitutional constraints. And what do you want us to say? Yes. Thank you. What I wanted to say... What we'd like you to say is, first, on the most limited level, we want you to affirm the preliminary injunction in Mr. Juth's case and say that it was proper application of this court's precedent in Tijani and in Nairaja. We want you to remand Mr. Sowett's case with directions to grant the habeas petition based on, again, that it was the proper application of this court's decisions in Tijani and Nairaja. And in terms of providing guidance for the future, we think that the appropriate way to read Tijani and Nairaja together is that when detention exceeds a presumptively reasonable period of six months, that hearing... No, the difficulty is that their time between six months would be excessive. Excuse me? I think you want a ruling that if you detain more than six months, you have violated some constitutional right, at least a question of... Well, Judge Ferris, if you want to make that ruling, that's fine with us. But we're actually asking for something more limited. We're saying just that at six months, that's the presumptively reasonable period for detention. So once detention surpasses that point, it's reasonable to say it's prolonged, and therefore a hearing is required before an immigration judge where the government bears the burden of showing that prolonged detention is justified. And we think, you know, we think, of course, these individuals can also go into habeas, but habeas is not an adequate remedy because, in fact, there's a case that we cited in our amicus brief, Jody Dalino, which makes it clear it was in a civil commitment context, I think, where the court said the fact that somebody could go into habeas is not enough because that involves the person actually having to do it. And here we're dealing with people who are unrepresented. Most people can't bring habeas action. Of course, this is why if there's an immigration judge hearing and it's incumbent on the government, hopefully the court will not be seeing as many of these habeas petitions. Counsel, I'm intrigued by your argument because you're taking two cases that were clearly under 236. You were not in 241 at all. Both Tahani and Nadaraj had involved pre-removal, pre-final administrative order hearing. There's a statute... Mr. Tajani didn't. By the time the Court of Appeals ruled in Mr. Tajani's case, he had the BIA decision and he had a stay of removal. But the stay stopped the removal from starting, did it not? It had actually been in detention for a month or two or I can't remember how long before the detention... It speaks to that though. And I guess my point is that we're bound by our case law but we're bound by the facts of the cases that are decided. They're not like a giant alien condom that stretches all over the entire subject matter. We have to be based on the facts. And in the facts of the two cases that you decided, we're not talking about 1241 or 241. You know, with all due respect, Your Honor, I think that the facts... First of all, both of these cases were statutory decisions. They weren't constitutional... I understand. decisions. So in Tijani, the Court was construing the statute that authorized Mr. Tijani's detention at the point where he had a stay of removal. That was the statute that governed. We think that it makes no sense to say at that point it was 1226A. If it's 1231, so be it. Whatever it is, it's the same statute that's at issue here. There's no basis for saying that the statute that was construed in Tijani is different than the statute that applies to all of these petitioners who are also detained pursuant to a stay. In Tijani, the Court sent this back to an immigration law judge for a bail hearing, right? And that's what we're saying. We're saying they did that as a matter of statutory construction of saying that the statute requires that. So if it's the same statute here, our position would be the same thing follows. A hearing is required before an immigration judge when detention exceeds 1231. What about if you're in the removal period? Say that somebody hasn't even been detained until then. If you're in the removal period, then you're under 1231. In that case, you don't go to an administrative law judge, right? That would be a separate issue. Some of your colleagues are dealing with that situation, are they not? I don't believe so. I think that all of our clients are in the same situation. Nobody's in the post-removal period. All of them have stays of removal. They have acted to present their removal. And so therefore, they're saying that they should be considered as if they're under 241. Our position is similar to what I believe to say that this is acting to present your removal is not consistent with what the statute meant by that. And especially if you look, there's another statute, I think it's 1324D, which is a civil penalty statute which says that when somebody acts to prevent removal, they can be fined up to $500 a day for each day of that. If the government was right that acting to prevent removal is what this means, then you'd be having that anybody who requests a stay needs to get a civil penalty. But even to put that aside, what we're saying is, whatever statute it was, if it's 1231 or 1226, that was the statute that governed into Johnny. And this Court... You're conflating the statutes, aren't you? No, I'm not conflating the statutes, Your Honor. Maybe I think that my time is up, but... It is, but answer your question. Okay. Basically, the structure of the statutes are, you have the pre-final order, you have the statute 1226, which applies pending a decision on removability. And I want to point out, the decision on removability actually is open. I mean, I think that the decision on removability you can actually say means a final decision after judicial review. So, I think that there's an argument right there that 1226 can control detention, I mean, can authorize detention up through that. 1231, on the other hand, talks about detention during the removal period and beyond the removal period. Here, none of our clients... There's no question that none of our clients are in the removal period now. Their removal has been stayed, which means that the removal period is not going to begin until the stay ends. What if the three-month period has passed at some point when there was no stay in effect? I don't think that matters, Your Honor, because if you look at the statute, it says the removal period commences at the latest of the following. Let's say there's a final administrative order and at some point after that period, for a period 90 days or more, the alien has no stay in effect. Would you agree that the removal period has begun in the 90 days in front? Yes. Right, but I would say that once there's a stay, then that person is no longer continuing to be detained during the removal period because the removal period is going to begin again. In fact, the government takes this position. The government takes the position that when a judicial review is completed, the removal period starts from day one. They don't take the position that, well, it's already been 90 days and now we continue with another. I just want to be sure I understand, Your Honor. Let's just say that on day one, there's a final administrative order on day one. There is no stay in effect. So 10 days passes. Do you agree that the removability period starts on day one? Yes. And then on day 10, a stay comes into effect. That means basically it's told at 10th day, right? I actually don't think it's told. I think at that point, the removal period is no longer in effect because it's going to start again after the stay. So at this point, because there's a stay, the individual is still pursuing... You're saying it goes back to the beginning again? I think that this is the problem. I can't remember which of you pointed this out. I think it was Judge Smith. I know. But I think it was the question about there is no clear authority in this statute for detention during a stay. So what you are left to do, what the courts have been having to struggle with is, well, which one is it? Is it 1231 or is it 1226? Most of the courts have found, I mean, the Second Circuit found it in Wang. There's a number of other courts that have found that 1226 is more reasonable in terms of the language. I agree that there was the Eleventh Circuit that seemed to assume that it was 241, although there was no real examination of that statutory language that says the removal period begins when the stay is lifted. So you are in this situation where there's no good answer. Is it 1226 or is it 1231? Given that, you look at Tijani. Tijani seems to have assumed it was 1226, and I think based on this statutory language, and in fact, I don't know if I brought it with me, but there is, well, let's forget about unpublished decisions because we decide that they're not worth it. But so in any event, we think 1226 makes more sense in terms of the statutory language also because it authorizes detention pending a decision. And when you have judicial review, you're still waiting for a decision. Pending a decision as to removability. Yes, and that's what that is, pending a decision as to removability, which means are you going to be ordered removed? Are you going to get released? And that's the decision that this Court is going to be deciding in judicial review. So it makes as much, I mean, you can say that, whereas pending a post-final order detention scheme, and in fact, if you look at the regulations that the government says apply, the 241 regs, it's clear that they're looking at people who the purpose is to you cannot get released unless there are travel documents. They're not contemplating the situation. The government has done as good a job as it can to kind of fit this into that scheme, but the factors that the 241 looks at are not what you would look at when somebody has a stay of removal. So we're saying that this fits much more under 236, or 1226. I'm sorry about confusing those languages. 8 U.S.C. 1226. Under the regs there, immigration judges get to determine it. All we're saying is that when detentions prolongs the burdens on the government in an immigration judge hearing. All you're saying is give peace a chance, right? Exactly. You got it. I would like to just say one more thing, though, about the limitations of this custody review process, if they're not already obvious. I mean, none of our... It's already run to 15. Go ahead. It'll be short. None of our clients got an in-person interview, not to mention a hearing. Just to give you a sense of how inadequate these reviews were, Mr. Joof, his custody review said that he was a flight risk because he had no family connections. He's married to a U.S. citizen who lives 15 minutes away. That was the custody review that was used to justify his detention. Yeah, but I think in that case his marriage was late coming, wasn't it? No. He had been married for quite a while at that point. Before, when he was taken into detention, two years before he was married. Reverend Soth, all that it said was you're a flight risk because you have a stay of removal. That's not what we're talking about. I think we have the facts. Thank you. Just a few quick points in rebuttal. The first, and this is with regard to Mr. Costas' case, I hope on the record, I think it was Mr. Costas' name where it says that he had been detained for, I think, 11 months. Why don't you let them go. Oh, I apologize. I thought that you were presenting that. No. Absolutely. We'll restart the clock. We won't say that you're on. It's not being told. You have not been transmogrified. Thank you. The government intends to distinguish Tijani with this broad brush, saying that these individuals haven't challenged their removal orders. Of course, with Mr. Prieto, this is not true. He's challenged his removal order from the get-go. And just like Mr. Tijani, he has a final administrative order that is now seeking judicial  process. One small point regarding the individualized custody review that the government promotes. In this case, not only was there no interview with Mr. Prieto, but in their custody review, the government found that he was not a danger to the community. They made a finding that he wasn't a fight risk, and yet they still decided to keep him locked up. There was no justification provided, other than the fact that he was seeking judicial review. But I thought he was given a bail hearing the second time in which he was given a $15,000 if he posted the $15,000 bond, he would be out. Afterwards, when he filed his habeas, he was granted a custody hearing. We have to deal with what we're dealing with right now. And with that, even if Tijani weren't controlling, even if the burden were not on the government, when you look at this record, you have an individual where the government concedes there's no fight risk and no danger to the community, and he's been locked up for three years, the record compels that he be released. And we would ask this otherwise in order that he be granted a hearing where the government has a burden of demonstrating why he's justified his continued prolonged detention. I have two brief points. I'm kind of intrigued that Mr. Dupuis wants to say something about Mr. Casas now, but I'm not quite sure. Don't use up your time. Okay, I'll try to reserve two seconds of my time for that. One point is there's been a lot of discussion about the custody reviews that take place and that ICE conducts all these well-structured custody reviews, and that therefore there shouldn't be any problem with substantive due process. I want to point out that that argument has been solidly rejected already by the Supreme Court in Zebaitis, that Justice Kennedy at length argued that there should be no relief in Zebaitis because there was this elaborate custody review procedure that was procedural due process. The majority said that their analysis applies quote, irrespective of the procedures used. That is, they flatly rejected that the procedural niceness of the custody review somehow satisfies the substantive due process issue. In fact, that was the third argument that the Fifth Circuit had used in rejecting Mr. Zebaitis' petition. And of course, the Fifth Circuit was overruled by Zebaitis. So they rejected that idea that simply because you've had adequate custody reviews, you don't have a substantive due process claim. The government also referred to the fact that, well, aliens can conduct their petitions for review from abroad. That's true. But what I pointed out in my reply is that if that were the case, Mr. Casas, if he should win tomorrow when the court hears his case, he will have apparent victory because there's such a thing as the departure bar, which means that anyone who departs the country before their administrative process, review process, is completed weighs their appeal. That is, Mr. Casas... What's the cite on that? Your Honor, I cited that in my brief. In fact, I attached the regulations in the addendum to my reply brief. The government argued, well, you can always fight your petition for review from abroad, but if you win your appeal, but then you can't go back on a remand to the IJ and then pursue an administrative appeal to the BIA, it's a total period of victory. You've won nothing. The government is engaging in a showdown by saying, yes, go ahead, go back to Colombia, Mr. Casas. You can fight your petition from there. Okay, I think we got the point. Okay, thank you, Your Honor. A few quick points in the bottle. The one with which I wanted to begin was with regard to Judge Smith's chart about the time of detention. I think Mr. Casas may be the longest-serving detainee out of the group, and I think Your Honor referred to five, six years. I think it's important to note that for more than three years at that time, Mr. Casas was not cooperating with ICE because he refused to complete his travel documents. That would permit us to have a So I think to the extent that he says, well, I've been kept for six or seven years, I think it's very important for this Court to note that for more than a three-year chunk of that, he was simply refusing to complete his travel authorization form. He finally elected to do it in November 2005. So you cite Palichew for that, right? The case that... I think it's Palichew. Yes, exactly. Palichew, I'm sorry. And the Lima case is the name of the case. And that's the other one where A1C undisputably applies to that conduct. The second point, and this is a theme that a number of the petitioners have sounded, is the notion that there is something inherently unfair about quote-unquote requiring the detainees, the petitioners, to prosecute their PFR claims at the price of having to remain in detention. I think it's important to note that that argument was squarely presented and squarely rejected by the Supreme Court in the Damore case, where the court said, and I'm quoting, Respondent contends that the length of detention required to appeal may deter aliens from exercising their right to do so. As we've explained before, however, the legal system is replete with situations requiring the making of difficult judgments as to which course to follow, and even in the criminal context, there's no constitutional prohibition against requiring parties to make such choices. The final point I want to make is when this court begins consideration as to whether 236 or 241 applies, as I know it will, I simply wanted to call the court's attention and make sure it does not get lost in the shuffle to INA 242B8, which is the provision that says when the Court of Appeals grants a stay of removal pending review, that stay does not prevent the Attorney General from detaining the alien under Section 241. I would submit that there's no possible way this court can resolve the 236-241 case in Petitioner's favor while maintaining fidelity to 242B8. Thank you. Thank you. Thank you, Counsel. It's been a fascinating morning, creeping into the afternoon. We appreciate your helping us sort our way through. Cases argued are submitted. Thank you.
judges: Farris, Fisher, Smith